1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8    Gilbert MH LLC,                      )    No.  CV-18-04046-PHX-SPL
                                          )
9                                         )
                    Plaintiff,            )
10                                        )    **FINDINGS OF FACT AND**
     vs.                                  )    **CONCLUSIONS OF LAW**
11                                        )
                                          )
12   Gilbert Family Hospital LLC, et al., )
                                          )
13                  Defendants.           )
                                          )
14   _____  )

15          Plaintiff filed this action on November 13, 2018, asserting claims for (1) breach of

16   personal guaranty against Defendant Justin Hohl, (2) breach of personal guaranty against

17   Defendants Henry and Karen Higgins, (3) fraudulent misrepresentation against Defendant

18   Higgins, (4) breach of lease agreement against Defendant Gilbert Family, and (5) bad faith

19   against all Defendants. (Doc. 1 at ¶¶70–105). Plaintiff seeks general, special,

20   consequential, and punitive damages, as well as attorneys' fees and costs as provided in

21   the "relevant contracts and as provided by law." (Doc. 1 at 19). Defendants timely filed an

22   answer on December 18, 2018. (Doc. 13).

23          The Court has jurisdiction over this action under 28 U.S.C. § 1332. Plaintiff and

24   Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

25   (Docs. 1 at ¶8, 61 at 2).

26          This action, having been tried before the Court on September 14, 2021 through

27   September 17, 2021, and the Court having carefully considered the proposed findings of

28   fact and conclusions of law (Docs. 60, 62), the Joint Proposed Pretrial Order (Doc. 61), the

testimony received, and the exhibits admitted into evidence, hereby makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) and LRCiv 52.1:

## FINDINGS OF FACT

### The Parties, the Project, and the Lease Agreement

1. Henry and Karen Higgins (collectively the "Higgins") are a married couple and residents of the state of Texas. (Doc. 1 at 1).[1]

2. Dr. Henry Higgins, an emergency medicine physician, is the owner of Gilbert Family Hospital, LLC ("Gilbert Family"), a Texas limited liability company. (Doc. 61 at 2–3).

3. Dr. Justin Hohl, a resident of Salt Lake City, Utah, is a spine surgeon. (Trial Tr. Day 3 at 96:19–20).

4. Drs. Higgins and Hohl are partners on several different healthcare projects, including Gilbert Family. (Trial Tr. Day 3 at 96:23–97:3).

5. Coaction Development Group ("Coaction") is a limited liability company with experience constructing healthcare projects, including in the Phoenix market. (Trial Tr. Day 2 at 104:23–105:5).

6. Gilbert MH, LLC ("Gilbert MH") is an Arizona limited liability company. (Doc. 1 at 1).

7. Coaction and Gilbert MH, along with Coaction Architectural Group ("CAG") and Strategic Healthcare Partners ("SHP"), are all affiliated entities. (Trial Tr. Day 1 at 154:5–16).

---

[1] Citations to the trial transcripts refer to the transcripts by day. "Day 1" refers to the transcript of the proceedings held September 14, 2021, reflected at Minute Entry 90. "Day 2" refers to the transcript of the proceedings held September 15, 2021, reflected at Minute Entry 91. "Day 3" refers to the transcript of the proceedings held September 16, 2021, reflected at Minute Entry 92. "Day 4" refers to the transcript of the proceedings held September 17, 2021, reflected at Minute Entry 93.

8. Glen Adams is the Chief Executive Officer of Coaction, has a membership interest in CAG, and has an ownership interest in SHP. (Doc. 61 at 2; Trial Tr. Day 4 at 27:25–28:1).

9. Mr. Adams owns an approximate 70% interest in Gilbert MH. (Doc. 61 at 2).

10. Shawn Porter is the Chief Financial Officer of Coaction and the manager of Gilbert MH. (Trial Tr. Day 1 at 106:11–13, 23–25).

11. Mr. Porter owns an approximate 20% interest in Gilbert MH.  (Trial Tr. Day 1 at 107:2–4).

12. Jared Cox is a civil engineer and the Chief Operations Officer of Coaction. (Trial Tr. Day 2 at 3:15–16, 4:5–6).

13. Mr. Cox owns an approximate 10% interest in Gilbert MH. (Trial Tr. Day 2 at 31:1–2).

14. Joe Remes is a former employee of both Coaction and SHP. (Ex. 158 at 13:12–16, 39:3–8).

15. On or about October 9, 2017, Gilbert MH and Gilbert Family entered into a Lease Agreement (the "Lease Agreement"). (Ex. 6).

16. The Lease Agreement concerns the construction and lease of a micro-hospital building in Gilbert, Arizona (the "Project"). Gilbert MH is identified as the Landlord in the Lease Agreement, and Gilbert Family is identified as the Tenant. (Ex. 6 at 1).

17. Mr. Porter executed the Lease Agreement on behalf of Gilbert MH. (Trial Tr. Day 1 at 27:22–24).

18. Coaction formed Gilbert MH for the purpose of executing the Lease Agreement, and Gilbert MH was relying on Coaction to develop the Project. (Trial Tr. Day 1 at 106:17–22).

19. Dr. Higgins executed the Lease Agreement on behalf of Gilbert Family. (Doc. 61 at 3).

20. At or around the time of execution of the Lease Agreement, Gilbert Family paid a $150,000 security deposit to Gilbert MH. (Ex. 6 at 4; Trial Tr. Day 2 at 62:15–17).

21. Article. 24.1 of the Lease Agreement states that Dr. Higgins had "full power and authority under [Gilbert Family's] governing documents to execute and deliver this Lease in the name of, and on behalf of [Gilbert Family]." It goes on to state, "[T]his Lease is the legal, valid and binding obligation of such party, and is enforceable against such party in accordance with its terms." (Doc. 6 at 22).

22. The Lease Agreement is a valid contract between Gilbert MH and Gilbert Family.

23. Article 40.3 of the Lease Agreement provides that any dispute between the parties concerning the Lease Agreement is to be "governed by and construed in accordance with the laws of the state in which the Premises are located without regard to the conflict of law principles thereof." (Ex. 6 at 28). The site of the Premises defined in the Lease Agreement is Arizona. (Ex. 6 at GFH000036).

24. Article 44.1 of the Lease Agreement is an integration clause that provides that the Lease Agreement "encompasses the entire agreement of the parties" and that "[t]he parties have not relied on any representations or assurances made by or on behalf of the other party. (Ex. 6 at 29–30).

25. Article 41.1 of the Lease Agreement (the "Anti-Waiver Clause") states, "No failure by either party to insist on the strict performance of any covenant, duty or condition of this Lease or to exercise any right or remedy on a breach of this Lease by the other party shall constitute a waiver of such covenant, duty, condition or breach. Any waiver shall be in writing and no waiver by either party will imply or constitute its further waiver of the same or any other matter." (Ex. 6 at 29).

26. On or about October 4–5, 2017, the Higgins and Dr. Hohl executed personal Guaranties of Lease. (Trial Tr. Day 3 at 134:9–11, 164:15–17; Ex. 58 at 14:24–15:3). The Guaranties were included in the Lease Agreement as Exhibit F. (Ex. 6 at GFH000054–58).

27. The personal Guaranty of Lease executed by the Higgins is a valid contract between Gilbert MH and the Higgins. The personal Guaranty of Lease executed by Dr. Hohl is a valid contract between Gilbert MH and Dr. Hohl.

28. The personal Guaranties of Lease provide that the Higgins and Dr. Hohl "absolutely and unconditionally guarantee[ ] the payment and performance of, and agree[ ] to pay and perform as primary obligor[s], all liabilities, obligations, and duties (including but not limited to payment of rent) imposed upon [Gilbert Family] under the terms of the [Lease Agreement]." (Ex. 6 at GFH000054, GFH000057).

29. The personal Guaranties of Lease state, "Upon any default of [Gilbert Family] under the Lease, [Gilbert MH] may, at its option, proceed directly and at once, without notice of such default, against Guarantor to collect and recover the full amount of the liability hereunder or any portion thereof without proceeding against [Gilbert Family] or any other party . . . ." (Ex. 6 at GFH000054, GFH000057).

**Dr. Higgins's Financial Disclosures**

30. In August 2017, Mr. Porter requested that Dr. Higgins provide documents demonstrating his personal finances so Mr. Porter could assess Dr. Higgins's creditworthiness and ability to perform on the Lease Agreement. (Trial Tr. Day 1 at 48:24–49:16). Dr. Higgins provided a Personal Financial Statement ("PFS") on a standard U.S. Small Business Administration Form dated June 26, 2017. (Ex. 9). The PFS was signed by the Higgins. (Trial Tr. Day 3 at 165:7–11; Ex. 58 at 18:2–13).

31. Dr. Higgins completed the PFS with the assistance of bankers and other advisors. To the best of his knowledge, the information in the PFS was accurate. (Trial Tr. Day 3 at 91:17–92:2).

32. On the PFS, Dr. Higgins listed various assets, including his cash on hand and accounts receivable. (Ex. 9 at GMH-037271). The form calls for a description of the accounts receivable in Section 5. Section 5 of Dr. Higgins's PFS states, "Dr. Higgins

has included his business assets and liabilities at gross value in his PFS." (Ex. 9 at GMH-037273).

33. Also in August 2017, Dr. Higgins's accountant, on Dr. Higgins's behalf, provided Mr. Porter with an accounting of the profits and losses of a hospital owned by Dr. Higgins. (Trial Tr. Day 1 at 54:23–55:3; Ex. 13).

34. In October 2017, Dr. Higgins provided Mr. Porter with his 2016 tax return. (Trial Tr. Day 1 at 53:8–11; Ex. 8).

35. At the time that Dr. Higgins provided Mr. Porter with his financial documents in the fall of 2017, Mr. Porter had the opportunity to ask Dr. Higgins questions about them or to request additional documents, but Mr. Porter did not do so. (Trial Tr. Day 1 at 156:4–13).

36. Mr. Porter re-analyzed Dr. Higgins's financial documents in mid-2018 and questioned whether they were accurate. (Trial Tr. Day 1 at 156:11–18).

37. When Gilbert MH filed suit against Dr. Higgins for fraud, it had no information that anything in in his financial documents was false. It intended to use the discovery process to dig into Dr. Higgins's finances. By the time of trial, it had not obtained any additional financial documents from Dr. Higgins. (Trial Tr. Day 1 at 156:19–23, 158:11–13, 159:12–19).

**Formation of Gilbert Family Hospital, LLC**

38. Article 24.1 of the Lease Agreement states that Gilbert Family "represents and warrants" that it "was duly formed and is validly existing and in good standing under the laws of the state of its formation." (Ex. 6 at 21).

39. At the time the Lease Agreement was executed, Gilbert Family was not duly formed and did not validly exist. (Trial Tr. Day 3 at 149:8–10).

40. Prior to the Lease Agreement's execution, Dr. Higgins spoke to Mr. Porter on the phone and expressed concern about signing the Lease Agreement before Gilbert Family had been formed. (Trial Tr. Day 3 at 47:3–10).

41. In the week before the Lease Agreement was executed, Drs. Higgins and Hohl discussed the terms of the Lease Agreement with Alan Laulainen, Coaction's Executive Vice President of Real Estate, via email. On October 9, 2017, the same day the Lease Agreement was executed, Mr. Laulainen sent an email asking, "Is Gilbert Family Hospital, LLC going to be a Texas, or an Arizona LLC?" Dr. Higgins responded to Mr. Laulainen stating, "We are planning to have the business founded in Texas." Mr. Porter was copied on Dr. Higgins's email. (Ex. 105).

42. The Court finds Gilbert MH had actual knowledge that Gilbert Family was not duly formed and was not validly existing on the day the Lease Agreement was executed, yet Gilbert MH still proceeded with the Project over the next year.

43. On December 19, 2017, Mr. Porter sent an email to Dr. Higgins stating that Gilbert MH's attorneys had not been able to find Gilbert Family as an entity in the public records of Texas and asking Dr. Higgins to "advise on the status of this." (Ex. 106). Mr. Porter does not remember receiving a response from Dr. Higgins, and he did not follow up on the matter. (Trial Tr. Day 1 at 32:20). Nonetheless, Gilbert MH proceeded with the Project.

44. Gilbert MH never executed a written waiver of Gilbert Family's representation and warranty under Article 24.1 of the Lease Agreement. (Trial Tr. Day 1 at 33:24–33:1).

45. Gilbert Family was organized as a Texas limited liability company ("LLC") in September 2018, almost a year after the Lease Agreement was executed. (Doc. 61 at 4).

**Rent Under the Lease Agreement**

46. Article 5.1 of the Lease Agreement states, "Beginning on the Rent Commencement Date, [Gilbert Family] covenants and agrees to pay to [Gilbert MH], the base rent ("Base Rent") . . . ." (Doc. 6 at 2).

47. The Lease Agreement does not define a sum certain for the Base Rent but instead provides a formula for calculating it. (Doc. 6 at GFH000046).

7

48. Exhibit C-1 of the Lease Agreement states that the Base Rent would be calculated using the following formula: Landlord's Costs x (2.9% + Actual Market Capitalization Rate). "Landlord's Costs" are defined as "the aggregate of all actual, direct costs incurred by [Gilbert MH]." The "Actual Market Capitalization Rate" is defined as "the market capitalization rate used in a purchase and sale agreement between [Gilbert MH] and a bona fide buyer." (Doc. 6 at GFH000046).

49. The Lease Agreement required Gilbert MH to "provide an accounting summary to [Gilbert Family] of the final Landlord's Costs no later than fifteen (15) days before the estimated date of delivery of the Certificate of Occupancy from the applicable governmental entity." (Doc. 6 at GFH000046).

50. The Lease Agreement does not provide a cap on the Base Rent amount.

51. Gilbert MH never represented that it could deliver the Project with a guaranteed maximum Base Rent. (Trial Tr. Day 2 at 115:22–116:8).

52. Gilbert Family and Drs. Higgins and Hohl knew and understood at the time the Lease Agreement was executed that it did not provide a cap on the Base Rent amount. (Trial Tr. Day 3 at 108:17–25; 150:10–14).

53. The Lease Agreement includes a Preliminary Budget estimate for the Project's costs (Ex. 6 at GFH000045), but Gilbert Family and Drs. Higgins and Hohl knew and understood at the time the Lease Agreement was executed that it was merely an estimate and did not guarantee the Landlord's Costs for the purpose of calculating the Base Rent. (Trial Tr. Day 3 at 111:16–25).

54. Gilbert Family and Drs. Higgins and Hohl knew and understood at the time the Lease Agreement was executed that Gilbert MH had never built a micro-hospital like the Project. (Trial Tr. Day 3 at 109:13–16, 148:14–16).

**Drs. Higgins and Hohl's Rent Concerns and the Ensuing Discussions**

55. No later than January 5, 2018, Gilbert Family began expressing concern to Gilbert MH about the amount of the Base Rent. On that date, in response to updated

8

estimates of Gilbert MH's costs, Dr. Higgins wrote to Mr. Porter, "Our rent went from $57k per month to $105k per month. . . . I am afraid that [the] design work here may be pricing us out of feasibility." (Ex. 115).

56. On February 8, 2018, Dr. Hohl wrote in an email that "we are confident that [Gilbert Family's] model can support a $65,000 lease. However, the risk of that lease getting up towards $75,000 makes us very nervous." Mr. Porter responded by outlining variables that, if met, could result in a Base Rent of $65,000. (Ex. 126).

57. On May 18, 2018, Mr. Cox sent Drs. Higgins and Hohl an updated cost estimate that would result in a Base Rent of $75,862. (Ex. 128). The following day, Dr. Hohl emailed the cost estimate to Mr. Remes, stating, "[T]he costs and fees associated with this Gilbert project have spun totally out of control in my opinion." (Ex. 129).

58. Drs. Higgins and Hohl were concerned that Coaction was padding the fees it was billing Gilbert MH for Coaction's work on the Project. (Trial Tr. Day 3 at 101:7–20). Mr. Remes shared this concern. (Ex. 158 at 100:4–9).

59. Throughout June, July, and August of 2018, Gilbert MH and Gilbert Family engaged in discussions regarding the costs of developing the Project in response to Drs. Higgins and Hohl's concerns and pursued several options to lower the Base Rent.

60. On or about June 8, 2018, Dr. Higgins called Mr. Cox and Mr. Porter to request a fixed Base Rent of $65,000. (Trial Tr. Day 2 at 12:16–22). In an email to Mr. Adams, Mr. Porter, and Mr. Remes reflecting on the call, Mr. Cox expressed his beliefs that Dr. Higgins never expected the Base Rent to be as high as the updated cost estimates projected, Dr. Higgins was being honest and fair, Dr. Higgins was not terminating the Lease Agreement at that time, and Gilbert MH could be flexible in order to make the Project work. Later in the email thread, Mr. Adams responded, "I don't think we should concede anything at this point, they signed the lease same as us both sides are required to honor agreement or deal with the consequences . . . ." (Ex. 157).

61. On June 28, 2018, Mr. Porter sent Dr. Higgins a document showing the costs committed by Gilbert MH to the Project to that date. The document shows that Gilbert MH provided a courtesy discount of $289,869 on architecture and engineering ("A&E") costs. (Ex. 131). The discount was provided in response to Gilbert Family's concerns about costs. (Trial Tr. Day 2 at 50:13–17). Gilbert Family never asked for a discount. (Trial Tr. Day 3 at 62:24–25).

62. On July 12, 2018, Dr. Hohl emailed Mr. Porter proposing caps on certain categories of "soft costs" associated with the Project, such as A&E, administrative, financing, and legal costs, with a total cap on soft costs of $3,897,161. Mr. Porter responded, "Conceptually, fixing certain costs in the rent is fine. I just need to review the numbers with the team and get back to you." (Ex. 132).

63. On July 31, 2018, Mr. Porter emailed Drs. Higgins and Hohl a Proposed Amendment to the Lease Agreement (the "Proposed Amendment") that would define "Landlord's Costs" in the Base Rent calculation as "the sum of $3,897,161 plus the aggregate cost of construction." (Ex. 133 at 133-004).

64. On August 19, 2018, Gilbert Family's counsel sent an email to Gilbert MH's counsel regarding the Proposed Amendment. In the email, Gilbert Family's counsel stated, "While I understand that [Gilbert MH] may not know the costs, yet; it [ ] was agreed by the parties early on that rent would not exceed $65,000 per month, so this needs to be put in writing. . . . Dr Hohl and Dr Higgins have not yet been serviced with an itemized breakdown showing all of the costs that Coaction claims to have paid on this project. In learning that some of these soft costs have nearly tripled as compared to what was agreed upon my clients need to have a guaranteed maximum price for rent to move forward." (Ex. 34 at GFH001327).

65. Later in the same email, Gilbert Family's counsel wrote, "But, let me be clear, my clients want to move forward to make the transaction, but it seems that so many material terms were not set forth in the lease agreement and there are still many

10

unknowns. I wonder if it may be best to sit down in person and attempt to hash out a new agreement based on what is now known. Otherwise, if can't come to some written agreement on costs, my client will need to start considering other options. Please let me know." (Ex. 34 at GFH001328).

66. Gilbert Family rejected the Proposed Amendment. (Trial Tr. Day 3 at 178:4–5).

67. Through its counsel's email on August 19, 2018, Gilbert Family expressed an intention not to perform under the terms of the Lease Agreement. By that time, Gilbert Family only intended to move forward with the Project if Gilbert MH agreed to fix or cap the Base Rent.

68. On August 31, 2018, Gilbert MH, through its counsel, offered to amend the Lease Agreement to set a fixed rent of $75,000 per month. (Ex. 37). Gilbert Family did not accept the offer. (Trial Tr. Day 1 at 82:11–13).

**The Design Process for the Project**

69. After the Lease Agreement was executed in October 2017, David Derr and Mr. Cox began working with Drs. Higgins and Hohl to design the Project in a way that would serve Gilbert Family's functional needs, meet the Arizona Department of Health Services ("AZDHS") hospital licensing requirements, and be approved by the Town of Gilbert. (Trial Tr. Day 2 at 6:9–16). Mr. Derr was a Coaction employee and the principal architect for the Project. (Trial Tr. Day 2 at 4:8–19).

70. Between October 2017 and April 2018, the design and size of the Project fluctuated greatly. (Trial Tr. Day 2 at 8:17–9:4).

71. On or about March 30, 2018, AZDHS gave preliminary approval of the design plans for the Project. (Trial Tr. Day 2 at 7:20–25).

72. On April 3, 2018, Gilbert MH closed on the land on which the Project would be built (the "Land"). (Trial Tr. Day 2 at 9:21–22).

73. Section 5 of Exhibit B-1 of the Lease Agreement states that within 120 days of closing on the Land, Gilbert MH must prepare and submit to Gilbert Family "75%

11

completed construction drawings ("Construction Drawings"), including the proposed architectural, structural, mechanical and electrical drawings and civil engineering plans . . . for [Gilbert Family's] approval, which approval shall not be unreasonably withheld, conditioned, or delayed." (Ex. 6 at GFH000038).

74. The date 120 days after April 3, 2018 was August 1, 2018.

75. Section 9 of Exhibit B-1 of the Lease Agreement states that Gilbert MH and Gilbert Family "shall in good faith review and approve (or reject), process and perform any obligation pursuant to the Lease concerning approval of plans, or concerning the construction of Landlord's Work with all due diligence and reasonable speed." (Ex. 6 at GFH000040).

76. Beginning in or around July 2018, as Gilbert Family was becoming increasingly concerned about the Base Rent amount, Drs. Higgins and Hohl stopped participating in the design process and failed to respond to inquiries from Gilbert MH regarding the design of the Project.

77. On July 3, 2018, Mr. Derr emailed Drs. Higgins and Hohl a link to a set of 50% complete construction drawings (the "50% Drawings") for the Project. Mr. Derr wrote, "I would very much like to review where we are with you if you can find the time. There may be items we are including that are not required in your opinion or items that require modification to meet your needs." (Ex. 33).

78. On July 18, 2018, Mr. Cox emailed Drs. Higgins and Hohl following up on Mr. Derr's request for a meeting, emphasizing, "We are at a point in the process where we really need to make time for this step." (Ex. 32).

79. On July 23, 2018, Mr. Derr emailed Dr. Higgins again requesting a meeting to review the 50% Drawings. (Ex. 33).

80. Neither Dr. Higgins nor Dr. Hohl responded to any of the requests for a meeting regarding the 50% Drawings, nor did they otherwise review the 50% Drawings with Mr. Derr or anyone from Gilbert MH. (Trial Tr. Day 2 at 16:13–20).

81. It was unreasonable for Gilbert Family, Dr. Higgins, and Dr. Hohl to fail to meet with Mr. Derr or another Gilbert MH representative to review and approve the 50% Drawings.

82. On July 30, 2018, Mr. Cox emailed Drs. Higgins and Hohl a link to what he clearly identified as "75% Construction Drawings" in accordance with Section 5 of Exhibit B-1 of the Lease Agreement. (Ex. 32).

83. Mr. Cox, a civil engineer, testified that the Construction Drawings were, in fact, 75% complete, as required by the Lease Agreement. (Trial Tr. Day 2 at 19:11–16). However, he also testified that structural engineering sheets were inadvertently omitted. (Trial Tr. Day 2 at 65:2–7). While Mr. Cox testified that the omission was immaterial, he did not expound upon that statement, and the Court does not credit that portion of his testimony. (Trial Tr. Day 2 at 67:10).

84. Dr. Higgins, a physician, testified that the Construction Drawings were not 75% complete. (Trial Tr. Day 3 at 72:20). However, he offered no substantive explanation of what was lacking in the drawings.[2]

85. The Court lacks sufficient evidence to determine whether the Construction Drawings were, in fact, 75% complete.

86. Section 5 of Exhibit B-1 of the Lease Agreement states, "[Gilbert Family's] failure to approve or reject the Construction Drawings within twenty (20) days following [Gilbert Family's] receipt thereof shall be deemed approval by [Gilbert Family]." (Ex. 6 at GFH000038).

87. The date 20 days after July 30, 2018 was August 19, 2018.

88. Section 5 of Exhibit B-1 of the Lease Agreement further states, "If [Gilbert Family] rejects the Construction Drawings, it shall indicate with specificity the respects in

---

[2] The Court notes that many pages of the Construction Drawings are labeled "50% Construction Documents," but a label alone is not sufficient proof of the completeness of a drawing. (Ex. 31 at GMH-039945–GMH-039973).

which they are not found to be acceptable and [Gilbert MH] shall have such corrections made and submitted to [Gilbert Family] for approval. The process . . . shall be repeated, if necessary, until the Construction Drawings finally have been approved or deemed approved by [Gilbert Family]." (Ex. 6 at GFH000038).

89. On August 19, 2018, Gilbert Family notified Gilbert MH that Gilbert Family "must reject the Construction Drawings at this time" because "some of the design appears to be grossly oversized for example the inpatient treatment rooms are approximately 240 square feet when they are only required to be 120 square feet." (Ex. 34 at GFH001327). This statement amounted to a reasonable, good-faith rejection of the Construction Drawings that specifically indicates at least one respect in which Gilbert Family found them unacceptable.[3]

90. In a letter to Gilbert Family dated August 23, 2018, Gilbert MH outlined potential negative consequences of reducing the inpatient treatment rooms to 120 square feet, but stated that Gilbert MH agreed to reduce the room size accordingly. (Ex. 35).

91. However, Gilbert MH never made the corrections to the room size in the Construction Drawings to submit to Gilbert Family for approval as required by Section 5 of Exhibit B-1 of the Lease Agreement. (Trial Tr. Day 2 at 25:9–11).

92. Thus, even if they were 75% complete, no set of Construction Drawings was ever approved or deemed approved by Gilbert Family.

**The Subordination Agreement and Estoppel Certificate**

93. Article 17.1 of the Lease Agreement provides that "within ten (10) business days after the receipt of a written request from [Gilbert MH] or any Encumbrance holder, [Gilbert Family] shall execute a commercially reasonable subordination agreement

---

[3] The parties disagree as to whether the supplemental comments on the Construction Drawings made by Gilbert Family through counsel on September 6, 2018 (Ex. 39) were timely. However, because the Court finds that the Construction Drawings were never approved due to Gilbert Family's failure to submit for Gilbert MH's approval a set of corrected drawings with smaller inpatient treatment rooms, the Court need not consider Gilbert Family's September 6 comments.

14

together with any customary additional documents evidencing the priority of the Encumbrance and the subordination of this Lease with respect to such Encumbrance." (Ex. 6 at 14).

94. Article 18.1 of the Lease Agreement provides that "[Gilbert Family] shall within ten (10) days after a request by [Gilbert MH], execute and deliver to [Gilbert MH] an estoppel certificate in commercially reasonable form in favor of [Gilbert MH] and such other persons as [Gilbert MH] may reasonably request." (Ex. 6 at 14).

95. On August 22, 2018, Gilbert MH's counsel emailed Gilbert Family's counsel a Subordination Agreement and an Estoppel Certificate from Gilbert MH's construction lender for execution by Gilbert Family. (Ex. 36 at GMH-039558– GMH-039560). The Subordination Agreement and Estoppel Certificate were sent three days after Gilbert Family rejected the Construction Drawings and indicated it would not move forward with the Project without a fixed or capped Base Rent.

96. The Estoppel Certificate required Gilbert Family to certify that "[a]s of the date of this certificate . . . [Gilbert MH] has satisfactorily complied with all of the obligations, duties, requirements, and conditions" of the Lease Agreement and that the Lease Agreement "is in full force and effect and [Gilbert Family] is not in default thereunder and there exist no facts that would constitute a basis for any default under the Lease." (Ex. 36 at GMH-039573).

97. The Subordination Agreement required no such certification. (Ex. 36 at GMH-039564–GMH-039572).

98. The purpose of the Subordination Agreement was to subordinate Gilbert Family's rights under the Lease Agreement to those of a lender financing construction for the Project. (Trial Tr. Day 1 at 39:6–11).

99. Gilbert MH stated that it would accept execution of the Estoppel Certificate as a written assurance of performance to cure the anticipatory breach that it asserted had

occurred due to the statements Gilbert Family had made "suggesting they might not honor the Lease Agreement." (Ex. 37).

100.     Drs. Higgins and Hohl did not feel comfortable signing the Subordination Agreement or the Estoppel Certificate due to the lack of agreement on design plans for the Project. (Trial Tr. Day 3 at 78:18–25, 104:25–105:6).

101.     Neither Dr. Higgins nor Dr. Hohl ever signed the Subordination Agreement or the Estoppel Certificate. (Trial Tr. Day 3 at 104:20–23, 151:19–152:11).

102.     Given the tumultuous state of the Project and its uncertain future at the time Gilbert MH requested that Gilbert Family execute the Subordination Agreement and the Estoppel Certificate, the documents were not presented in a commercially reasonable form as required by the Lease Agreement. Gilbert Family could not reasonably make the certifications contained in the Estoppel Certificate at that time. Nor was it commercially reasonable for Gilbert MH to request that Gilbert Family execute a Subordination Agreement for a construction lender when Gilbert Family had not agreed to the design of the Project and it was not clear that the Project would actually proceed to construction.

**Drs. Higgins and Hohl's Discussion of a Scottsdale Facility**

103.     Sometime before September 20, 2018, Drs. Higgins and Hohl began investigating another business opportunity that involved leasing a hospital facility in Scottsdale, Arizona (the "Scottsdale Facility"). (Trial Tr. Day 3 at 140:21–141:2).

104.     On September 20, 2018, Dr. Higgins sent Dr. Hohl an email regarding the Project and the Scottsdale Facility. In the email, he discussed which had greater revenue potential. (Ex. 40).

105.     Drs. Higgins and Hohl believed the monthly rent for the Scottsdale Facility would be about $110,000. (Ex. 40; Trial Tr. Day 3 at 141:4–6). The Scottsdale Facility would be a surgical hospital, which would generate more revenue than the Project. (Trial Tr. Day 3 at 142:7–10).

106.     In the September 20, 2018 email, Dr. Higgins discussed the possibility of adding a second operating room and a procedure room to the Project. He stated that Gilbert Family then "may end up with a rent rate that is in the mid $80,000-$90,000 range, a facility enjoying revenue streams from ER, OR, and inpatient." (Ex. 40).

107.     Drs. Higgins and Hohl were debating whether adding a second operating room to the Project and performing elective procedures there would boost Gilbert Family's revenues and allow it to afford higher rent. (Trial Tr. Day 3 at 142:12–16).

108.     On September 21, 2018, Dr. Hohl responded to Dr. Higgins's email from the previous day, writing, "As we move forward the reality is that two facilities right off the bat in Phoenix equals monthly rent payments of almost $200,000. . . . It may be more prudent to proceed in a Stepwise fashion and confirm our model. I see two options to do that: 1. get out of Gilbert with a lawsuit. 2. Put the brakes on Scottsdale." Dr. Higgins responded later that day, stating, "You and I are coming to the same conclusions." (Ex. 40).

109.     No later than September of 2018, Drs. Higgins and Hohl were contemplating trying to find a way out of the Project in favor of the Scottsdale Facility, believing the Scottsdale Facility may have greater revenue potential. Alternatively, Drs. Higgins and Hohl were contemplating drastic changes to the scope of the Project to increase its revenue potential.

**Termination and Remedial Provisions in the Lease Agreement**

110.     The Lease Agreement contains multiple provisions that give the parties the right to terminate the Lease Agreement that apply under different circumstances and allow for different remedies.

111.     Article 22 of the Lease Agreement enumerates various occurrences that amount to an "Event of Default" by Gilbert Family as well as Gilbert MH's rights upon such default. (Ex. 6 at 18–21).

17

112.    Under Article 22.1(iv) of the Lease Agreement, one such "Event of Default" occurs if Gilbert Family fails to perform its covenants and obligations under the Lease Agreement "where such failure continues for a period of thirty (30) days after written notice from [Gilbert MH]." (Ex. 6 at 18).

113.    If an Event of Default occurs, Article 22.2(i)(A) of the Lease Agreement allows Gilbert MH, "at its option and without further notice to [Gilbert Family]," to "terminate this Lease, in which event [Gilbert Family] must immediately surrender possession of the Premises to [Gilbert MH]." (Ex. 6 at 19).

114.    Article 22.2(iii)(D) of the Lease Agreement states that if Gilbert MH terminates the Lease Agreement due to an Event of Default, Gilbert Family must pay Gilbert MH the sum of "the cost of recovering the Premises," "the unpaid Rent and all other indebtedness accrued," "the total Rent which [Gilbert MH] would have received under this Lease for the remainder of the Term minus the Fair Market Rental Value . . . of the Premises for the same period" discounted to present value, and other specified costs. (Ex. 6 at 20).

115.    Section 5 of Exhibit B-1 of the Lease Agreement applies "[i]n the event that the parties are unable to mutually agree upon the Construction Drawings within sixty (60) days after the same are delivered to [Gilbert Family] for approval" and allows either Gilbert MH or Gilbert Family to terminate the lease in that event. (Ex. 6 at GFH000038).

116.    If the Lease Agreement is terminated under Section 5 of Exhibit B-1 of the Lease Agreement, "[Gilbert Family] shall reimburse [Gilbert MH] for fifty percent (50%) of any and all out-of-pocket expenses incurred by [Gilbert MH] pertaining to the Land, including, but not limited to, costs and expenses associated with due diligence reports and studies, architectural and engineering expenses, and legal fees." Section 5 of Exhibit B-1 further provides that Gilbert Family may apply a security

18

deposit paid by Gilbert MH to pay Gilbert Family's reimbursement obligations. (Ex. 6 at GFH000038).

117.     The Lease Agreement does not define how a party may effectuate termination.

**Gilbert MH's Notices of Default and Demands for Damages**

118.     On August 31, 2018, Gilbert MH sent Gilbert Family a letter stating that Gilbert Family needed to sign and return the Subordination Agreement and Estoppel Certificate by the end of the day on September 1, 2018 to avoid default. The letter also stated that Gilbert Family would accept execution of the Estoppel Certificate as a written assurance of performance to cure the asserted anticipatory breach resulting from Gilbert Family's statements that it would not perform under the Lease Agreement. (Ex. 38).

119.     On September 5, 2018, Gilbert MH sent Gilbert Family a letter asserting that Gilbert Family had breached the Lease Agreement by failing to execute the Subordination Agreement and Estoppel Certificate and that it had anticipatorily breached the Lease Agreement through its statements that it did not intend to honor its obligations under the Lease Agreement (Ex. 38).

120.     On October 1, 2018, Gilbert MH sent Gilbert Family a letter "provid[ing] formal notification that [Gilbert Family] has committed an Event of Default under the Lease Agreement as defined by Sec. 22.1(iv)" due to its failure to execute the Subordination Agreement and Estoppel Certificate. The letter ended by stating, "There will need to be a separate contractual agreement in the event the parties can reach an agreement for moving forward because of the Event of Default." (Ex. 41).

121.     On October 17, 2018, Gilbert MH sent Gilbert Family a letter to similar effect and demanding damages. On October 22, 2018, Gilbert Family rejected the demand. (Ex. 138).

122.     On October 18, 2018, Gilbert MH sent Gilbert Family a letter stating that the property that was to be used for the Project would be "listed and sold without further notice." (Ex. 42).

123.     No later than October 18, 2018, through its letters to Gilbert Family, Gilbert MH demonstrated an unquestionable intent that the Lease Agreement was no longer in effect. To the extent that Gilbert MH continued to discuss the Project with Gilbert Family after that date, Gilbert MH had expressed that a new contract would need to be executed.

124.     On October 17, 2018, Gilbert MH sent a letter to Drs. Higgins and Hohl notifying them of Gilbert Family's default and demanding damages from them pursuant to their personal Guaranties of Lease. (Ex. 53).

125.     Gilbert MH did not receive a response to its demand for damages from either Dr. Higgins or Dr. Hohl. (Trial Tr. Day 1 at 92:12–13).

126.     At the time Gilbert MH filed this lawsuit, it had a completed set of construction drawings, the Town of Gilbert's approval for the Project, and a general contractor who was going to construct the Project. (Trial Tr. Day 2 at 26:12–19).

**The Current State of Gilbert MH**

127.     The Project never moved forward to construction. (Trial Tr. Day 2 at 111:16–18).

128.     As of September 14, 2021, the lender that financed Gilbert MH's purchase of the land for the Project was in the process of foreclosing on it. (Trial Tr. Day 1 at 95:24–96:2). Gilbert MH and the lender stipulated that the lender would take the land for the amount of the principal on the loan. (Trial Tr. Day 2 at 181:23–25).

129.     On March 19, 2021, Gilbert MH filed a Voluntary Petition for Bankruptcy (the "Bankruptcy Petition"). (Ex. 154).

130.     Gilbert MH's creditors listed on the Bankruptcy Petition include Coaction, CAG, and SHP. (Ex. 154 at 154-009).

131. Gilbert MH has paid some of the bills from Coaction and from CAG related to the Project but has not paid any bills from SHP. (Trial Tr. Day 1 at 154:21–24).

**Gilbert MH's Out-of-Pocket Costs and Other Damage Claims**[4]

132. At trial, Gilbert MH stated that, if the Court were to award costs incurred, the Court should refer to Gilbert MH's Application and Certification for Payment ("Pay App") dated November 12, 2018 ("Pay App 14"), found at pages 454–464 of Exhibit 124, to determine the amount. Gilbert MH asserted that Pay App 14 details all the costs Gilbert MH had paid or been billed for in association with the Project through October 31, 2018 in the column labeled "Total Completed and Stored to Date." (Trial Tr. Day 4 at 54:15–24).

133. Exhibit 124 consists of 569 pages including Pay Apps, invoices, budgets, and time sheets without any clear organization or index.

134. Mr. Porter testified that the 17 Pay Apps found within Exhibit 124 were intended for internal use by Gilbert MH only. (Trial Tr. Day 1 at 94:8–11). He also testified that Gilbert MH did not always use the Pay App form as it was intended. (Trial Tr. Day 1 at 116:2–3).

135. The Court will refer to Pay App 14 as the basis for determining Gilbert MH's out-of-pocket costs but finds that the amounts stated therein are not credible on their own. The Court will only credit costs that are supported by other evidence, such as invoices, time logs, or proof of payment.

136. The Court cannot fathom why, when Gilbert MH's costs would have ultimately been subject to an accounting pursuant to the Lease Agreement in order to calculate the Base Rent, Gilbert MH and its affiliated entities would not have kept clear, detailed, contemporaneous records of the work performed and costs owed. The

---

[4] Because the Court finds that Section 5 of Exhibit B-1 of the Lease Agreement provides the appropriate basis for determining Gilbert MH's damages in this case, *see infra* Conclusions of Law ¶¶38–44, the Court does not address the amount that would be recoverable under Article 22 of the Lease Agreement.

fact that Gilbert MH and its affiliates did not provide such records to the Court leads the Court to question the validity of the asserted costs.

137.    Moreover, in September and October of 2018, as the Project was falling apart, both Coaction and SHP purported to bill Gilbert MH more than $350,000 each, apparently as lump-sum amounts, without any explanation or documentation. (Ex. 124 at 374, 464).

138.    Given the irregularities, in the case of costs billed by Gilbert MH's affiliates—Coaction, CAG, and SHP—the Court will credit only costs that are supported by detailed, itemized invoices or time sheets.

139.    The time sheets for work performed by CAG contained throughout Exhibit 124 were created by Mr. Cox on September 19, 2019, almost a year after Gilbert MH filed this lawsuit and the day before Mr. Porter presented them at his deposition. (Ex. 151 at 151-016). The Court will not credit CAG's time sheets as sufficient support for the work performed.

140.    Gilbert MH provided no evidence of its affiliates' standard rates or hours nor of industry standards for rates or hours for work comparable to the work purportedly performed by Coaction, CAG, and SHP on the Project.

141.    The Court finds evidence to support $600,142.62 of Gilbert MH's out-of-pocket costs stated in Pay App 14 (Ex. 124 at 455–63). The amount breaks down as follows:

///

///

///

///

///

///

///

| Pay App 14 Assertions | | | Court's Findings | |
|---|---|---|---|---|
| Item No.[5] | Description of Work[6] | Total Completed and Stored to Date[7] | Amount Evidenced | Citation[8] |
| 7 | Land Loan Fee | $38,600 | $38,600 | 268 |
| 8 | Land Due Diligence Fee | $5,000 | $5,000 | 55–57 |
| 9 | Land Interest | $135,721.84 | $135,721.84 | 273–74, 308, 345, 390, 439, 470 |
| 12 | Property Tax Credit from Seller (land) | ($2,162.80) | ($2,162.80) | 196 |
| 13 | Closing Fees & Title Insurance (land) | $3,070.99 | $3,070.99 | 196–200 |
| 15 | Owner GL Insurance | $415 | $415 | 220, 305 |
| 25 | Geotechnical Engineering | $2,000 | $2,000 | 75 |
| 27 | ALTA & Topographic Survey | $2,900 | $1,015 | 74 |
| 28 | Fire Flow Test | $550 | $550 | 223 |
| 29 | Environmental Engineering Phase I | $1,800 | $1,800 | 76 |
| 32 | Concept Cost Estimating | $6,432 | $6,432 | 162 |
| 33 | Structural Engineering – SD Narrative | $2,400 | $2,400 | 166 |
| 34 | MPE Engineering – SD Narrative | $9,800 | $9,800 | 224 |
| 36 | Closing Costs | $232 | $232 | 17, 25–26, 98, 139, 170 |
| 38 | Travel | $2,915.54 | $2,915.54 | 49, 112–24, 130–32, 140–41, 156–59, |

---

[5] Column A of Pay App 14.

[6] Column B of Pay App 14.

[7] Column I of Pay App 14.

[8] This column refers to the page number of Exhibit 124 that supports the amount evidenced.

| Pay App 14 Assertions | | | Court's Findings | |
|---|---|---|---|---|
| Item No.[5] | Description of Work[6] | Total Completed and Stored to Date[7] | Amount Evidenced | Citation[8] |
|  |  |  |  | 296–99, 309–11, 359–61 |
| 40 | Preliminary Landscape Plan | $7,103.75 | $7,103.75 | 232, 402–03, 451 |
| 44 | Tree Removal | $1,500 | $1,500 | 423–25 |
| 49 | Design Review Application Fee | $3,660 | $3,660 | 190–194 |
| 179 | Sign Fee | $152.43 | $152.43 | 339–42 |
| 181 | Plan Check Fee | $8,439.67 | $8,439.67 | 378–81 |
| 186 | Schematic Design TI's | $53,319 | $53,319 | 300 |
| 187 | Design Development TI's | $53,319 | $53,319 | 300 |
| 188 | Construction Document TI's | $53,319 | $53,319 | 300, 382 |
| 189 | Bid Administration TI's | $10,663.80 | $10,663.80 | 426 |
| 190 | Contract Administration TI's | $2,132.76 | $2,132.76 | 426 |
| 191 | TI Architect Reimbursables | $2,660 | $2,618.39 | 300–04, 382–86, 426–34 |
| 193 | Schematic Design Shell | $56,500 | $1,500 | 391 |
| 194 | Design Development Shell | $34,000 | $4,000 | 391 |
| 197 | Mechanical Engineering | $59,800 | $59,800 | 348, 441, 471 |
| 199 | Construction Documents Shell | $50,000 | $8,000 | 346 |
| 201 | Specification Writer | $4,000 | $4,000 | 312, 395 |
| 206 | Pre-Construction Services | $26,800 | $26,800 | 392 |
| 207 | Civil Engineering | $54,544.33 | $4,284.44 | 393–94, 420–22 |
| 216 | Schematic Design Cost Estimating | $7,585.59 | $7,585.59 | 216 |
| 220 | ALTA & Topographic Survey | $3,160 | $3,160 | 347, 440 |
| 221 | Printing & Postage | $493.13 | $493.13 | 251–52, 330–38 |
| 227 | Closing Fees & Title Insurance | $15,000 | $15,000 | 351–57 |

| Pay App 14 Assertions | | | Court's Findings | |
|---|---|---|---|---|
| Item No.[5] | Description of Work[6] | Total Completed and Stored to Date[7] | Amount Evidenced | Citation[8] |
| 240 | Property Taxes During Construction | $9,724.74 | $9,724.74 | 447 |
| 45 46 217 266 | Temp Fence Monthly Rental Temp Fence Installation . . . Temp Fence Monthly Rental Fence Re-Location | $1,652 $249.73 $324.42 $271.50 | $2,497.65[9] | 225–28, 253–58, 474–75 |
| 37 234 | Legal Fees Legal Fees | $25,345.75 $33,248.95 | $49,279.70[10] | 20–24, 51–52, 58–59, 70–73, 134–35, 163–64, 188–89, 195, 221–22, 266, 294, 306–07, 343–44, 349–50, 387–89, 435–38, 442–44 |
| | TOTAL | | $600,142.62 | |

142.     As to the Land Cost, Item No. 4 on Pay App 14, the Court will not include the amount of $1,650,000 as an out-of-pocket cost given that Gilbert MH retained the land and gave the land to the lender for the principal amount. *See supra* Findings of Fact ¶128.

---

[9] Rather than attempting to decipher the unexplained breakdown of certain costs in Pay App 14, the Court has aggregated its findings as to fence-related costs and legal fees.

[10] To be clear about how the Court arrived at the amount of legal fees, the Court did not credit the amounts billed in the invoices at pages 445–46 and 472–73 of Exhibit 124 because they do not include itemized time sheets. Nor did the Court credit the amounts found in the invoice at pages 349–50 of Exhibit 124 because the fees appear to be incurred based on the dispute between the parties rather than in furtherance of the Project. The Court notes that such fees may be recoverable in a subsequent motion for attorneys' fees, discussed *infra* note 12.

143.     As to the "Referral Fee to Tenant's RE Broker," Item No. 14, the Court finds that the purpose of this $100,000 cost was primarily business development for Coaction rather than an out-of-pocket cost for the Project. An email from the payee with instructions to complete the wire transfer also stated, "Its good to have our first deal closed," and included information about other projects for which the payee was seeking capital partners. Mr. Porter responded, "I look forward to learning more about your other projects that we could potentially partner with you on." (Ex. 124 at 269–72).

144.     As to the "Land Acq Real Estate Brokerage Fees," Item No. 270, the Court also finds that the purpose of this $30,000 cost was primarily business development for Coaction. In a letter to the payee to confirm the payment, a Coaction employee also wrote, "[W]hen Glen's travel schedule will allow, he would like to meet up with you to clear the air from any past issues you may have had with Coaction." (Ex. 124 at 230). Additionally, in the Pay App dated July 26, 2018, Gilbert MH reclassified the cost from "Commissions" to "Land Acq Real Estate Brokerage Fees," which further raises the Court's suspicions regarding the payment. (Ex. 124 at 289).

145.     The Court finds insufficient evidence to support all other amounts stated in the "Total Completed and Stored to Date" column of Pay App 14.

146.     Fifty percent of $600,142.62 is $300,071.31.

147.     $300,071.31 minus $150,000 is $150,071.31.

148.     In addition to out-of-pocket costs, Gilbert MH requested that if the Court were to award costs incurred, it also award lost profits. At trial, Gilbert MH asserted that its request for nearly $3 million in lost profits was supported by Mr. Porter's testimony. (Trial Tr. Day 4 at 54:1–3).

149.     Mr. Porter provided only a bare summary of his calculation of lost profits and explained that he estimated as to the Project costs, market capitalization rate, and sale price for the building. (Trial Tr. Day 1 at 88:14–23).

26

150.    Gilbert MH had not lost any expected rent profits as of October 2018 as there was no agreement on design plans for the Project, much less an actual, constructed micro-hospital for a tenant to occupy. (Trial Tr. Day 1 at 89:2–4).

## CONCLUSIONS OF LAW

**Breach of Contract Claim Against Gilbert Family**

1. Under Arizona law, in order to show a breach of contract, a plaintiff must demonstrate (i) the existence of a contract, (ii) a breach, and (iii) resulting damages *Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 96, 302 P.3d 617, 621 (2013).

2. A party waives strict compliance with a contract provision through either "express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment." *Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.*, 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980).

3. When a contract contains an anti-waiver clause, a party may nonetheless waive a particular provision, but only if it waives both that provision and the anti-waiver clause with respect to that provision. *See* 13 Williston on Contracts § 39.36.

4. A party's "long acquiescence" to another's failure to strictly comply with a contract provision warrants an inference of that party's intentional relinquishment of its rights under the anti-waiver clause with respect to that provision. *Dillingham Com. Co. v. Spears*, 641 P.2d 1, 8 (Alaska 1982); *see also, e.g.*, *Summa Corp. v. Richardson*, 564 P.2d 181, 235 (Nev. 1977); *Gonsalves v. Gilbert*, 356 P.2d 379, 384 (Haw. 1960).

5. The Lease Agreement was a valid contract. *See supra* Findings of Fact ¶22.

6. As to Gilbert MH's allegation that Gilbert Family breached the Lease Agreement because it was not duly formed and did not validly exist as warranted in Article 24.1 of the Lease Agreement, the Court finds that Gilbert MH waived Article 24.1 and the Anti-Waiver Clause through its conduct. Gilbert MH had actual knowledge that Gilbert Family was not in compliance with Article 24.1 on the day the Lease

27

Agreement was executed yet continued to proceed with the Project for almost a year before Gilbert Family was formed. Gilbert MH made no effort to enforce its rights under Article 24.1 or the Anti-Waiver Clause even as it continued to inquire as to the status of Gilbert Family's formation throughout that time. Gilbert MH thereby acquiesced to Gilbert Family's noncompliance and intentionally relinquished its rights under Article 24.1 as well as the Anti-Waiver Clause with respect to Article 24.1. *See supra* Findings of Fact ¶¶38–45.

7.  As to Gilbert MH's allegation that Gilbert Family breached Articles 17.1 and 18.1 of the Lease Agreement because it did not execute the Subordination Agreement and Estoppel Certificate, respectively, the Court finds that under the circumstances, neither the Subordination Agreement nor the Estoppel Certificate were in commercially reasonable form as required by Articles 17.1 and 18.1. *See supra* Findings of Fact ¶¶93–102. Thus, Gilbert Family did not breach Article 17.1 or Article 18.1.

8.  As to Gilbert MH's allegation that Gilbert Family breached Section 9 of Exhibit B-1 of the Lease Agreement by failing to respond to requests for meetings to review architectural plans in June and July of 2018, the Court finds that Gilbert Family did breach the Lease Agreement. Gilbert Family failed to "in good faith review and approve" the 50% Drawings "with all due diligence and reasonable speed" as required by the Lease based on their unreasonable failure to meet with Mr. Derr or another Gilbert MH representative to review and approve the 50% Drawings. *See supra* Findings of Fact ¶¶75–81.

9.  As to Gilbert MH's allegation that Gilbert Family breached Section 5 of Exhibit B-1 of the Lease Agreement by unreasonably delaying and conditioning its approval of the Construction Drawings, the Court finds that even if the Construction Drawings were 75% complete, Gilbert MH did not breach the Lease Agreement because it provided a reasonable, good-faith rejection of the Construction Drawings

within the 20-day timeframe provided by the Lease Agreement. *See supra* Findings of Fact ¶¶73, 82–89.

10. Under Arizona law, "[a]n anticipatory repudiation is a breach of contract giving rise to a claim for damages and also excusing the necessity for the non-breaching party to tender performance." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 283, 681 P.2d 390, 435 (App. 1983). To recover damages, the non-breaching party must prove both repudiation and that it would have performed under the contract absent the repudiation. *Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 95, 302 P.3d 617, 620 (2013).

11. Anticipatory repudiation occurs when there is "a positive and unequivocal manifestation on the part of the party allegedly repudiating that he will not render the promised performance when the time fixed for it in the contract arrives." *Diamos v. Hirsch*, 91 Ariz. 304, 307, 372 P.2d 76, 78 (1962) Likewise, "[i]f one party to a contract, either willfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed." *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 32, 730 P.2d 204, 210 (1986) (quoting 4 Corbin on Contracts § 973 (1951)).

12. In Arizona, parol evidence may not be used to interpret a contract if it "contradict[s] or var[ies] the meaning of the agreement." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993).

13. However, "parol evidence is always admissible to show fraud in the inducement of a contract." *Barnes v. Lopez*, 544 P.2d 694, 697 (Ariz. Ct. App. 1976). Fraud in the inducement occurs when a party "misrepresent[s] a material fact concerning the subject matter of the underlying transaction and the other party[ ] rel[ies] on the misrepresentation to . . . its detriment in executing a document." 21 Williston on

29

Contracts § 57:32; *see Wilson v. Byrd*, 79 Ariz. 302, 304, 288 P.2d 1079, 1081 (1955).

14. As to Gilbert MH's allegation that Gilbert Family anticipatorily repudiated the Lease Agreement by refusing to move forward with the Project without a rent cap, the Court finds that Gilbert Family did anticipatorily repudiate the Lease Agreement. The August 19, 2018 email from its counsel along with its conduct in the preceding months amounted to a positive and unequivocal manifestation that it would not continue to perform its obligations under the Lease Agreement as written. Rather, Gilbert Family conditioned its future performance on Gilbert MH agreeing to cap the Base Rent at $65,000. Throughout July and August of 2018, Gilbert Family continually requested a cap on the Base Rent while ignoring requests to meet about design plans for the Project. Gilbert Family was already demonstrating a resistance to proceed under the terms of the Lease Agreement, culminating in the statement that it "need[ed] to have a guaranteed maximum price for rent to move forward." *See supra* Findings of Fact ¶¶59–67.

15. To the extent that Gilbert Family argues the August 19, 2018 email still expressed a desire to move forward with the Project, its desire was conditioned on the demand for new terms to which it had no right under the Lease Agreement and thus further supports the finding of anticipatory breach.

16. To the extent that Gilbert Family argues that the parties had agreed to a maximum Base Rent prior to execution of the Lease Agreement, the parol evidence rule bars consideration of any such evidence. The Lease Agreement contains a clear, unambiguous, uncapped formula for calculating the Base Rent. Any evidence of a Base Rent cap contradicts the meaning of the Lease Agreement on its face. *See supra* Findings of Fact ¶¶46–52.

17. To the extent that Gilbert Family argues that the parol evidence rule is inapplicable because it was fraudulently induced into executing the Lease Agreement, the

30

argument fails. Gilbert MH made no representations as to a guaranteed maximum Base Rent. Further, Gilbert Family understood when it executed the Lease Agreement that Gilbert Family had never constructed a micro-hospital like the Project and that Gilbert MH's cost estimates were, in fact, estimates. Thus, even if Gilbert MH made any material representations, Gilbert Family did not rely on them in executing the Lease Agreement. *See supra* Findings of Fact ¶¶50–54.

18. The Court further finds that Gilbert MH would have performed under the Lease Agreement absent the repudiation. When it filed this lawsuit, it was prepared to proceed with construction of the Project. *See supra* Findings of Fact ¶126.

19. Finally, Gilbert MH has proven it was damaged by Gilbert Family's breaches of the Lease Agreement because it incurred significant costs in association with the Project and is entitled to reimbursement for those costs under the terms of the Lease Agreement. *See infra* Conclusions of Law ¶¶38–48.

20. In sum, Gilbert Family is liable to Gilbert MH for Breach of Contract based on its breach of Section 9 of Exhibit B-1 of the Lease Agreement and its anticipatory repudiation of the Lease Agreement.

**Breach of Personal Guaranty Claims Against the Higgins and Dr. Hohl**

21. The personal Guaranties of Lease executed by the Higgins and by Dr. Hohl, respectively, were valid contracts. *See supra* Findings of Fact ¶27.

22. The Higgins and Dr. Hohl have refused to pay the liability imposed upon Gilbert Family under the Lease Agreement as required by the personal Guaranties of Lease, and thus have breached the personal Guaranties of Lease. *See supra* Findings of Fact ¶¶28–29, 125.

23. Gilbert MH has proven it was damaged by the breaches of the personal Guaranties of Lease by the Higgins and Dr. Hohl because it incurred significant costs in association with the Project and is entitled to reimbursement for those costs under the terms of the Guaranties of Lease. *See infra* Conclusions of Law ¶¶38–48.

24. The Higgins and Dr. Hohl are therefore liable to Gilbert MH for Breach of Personal Guaranty.

**Fraudulent Misrepresentation Claim Against the Higgins**

25. In Arizona, a claim for fraudulent misrepresentation is established by showing that the defendant "made a false and material representation, with knowledge of its falsity or ignorance of its truth, with intent that the hearer would act upon the representation in a reasonably contemplated manner, and that the hearer, ignorant of the falsity of the representation, rightfully relied upon the representation and was thereby damaged." *Dawson v. Withycombe*, 216 Ariz. 84, 96, 163 P.3d 1034, 1046 (App. 2007) (emphasis omitted). The plaintiff "must demonstrate the speaker's knowledge of the falsity of the statement." *Id.* at 97, 1048.

26. There is no evidence that the Higgins made a false and material representation of their financial assets. Rather, the only clear basis for Gilbert MH's fraudulent misrepresentation claim—that the Higgins included business assets on their PFS— was explicitly disclosed on the PFS. *See supra* Findings of Fact ¶32.

27. Even if the inclusion of business assets on the Higgins' PFS did amount to a false and material representation, there is no evidence that the Higgins knew it was false. Rather, Dr. Higgins completed the PFS in consultation with advisors and believed it to be an accurate statement of the Higgins' finances. *See supra* Findings of Fact ¶31.

28. Thus, the Higgins are not liable to Gilbert MH for Fraudulent Misrepresentation.

**Breach of the Duty of Good Faith and Fair Dealing Claims Against Each Defendant**

29. "Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). A party that proves a breach of the implied covenant is entitled to contract damages. *Id.* at 491, 29.

30. The duty of good faith and fair dealing requires parties to a contract to refrain "from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.* at 490, 28. It "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). On the other hand, bad-faith conduct "violate[s] community standards of decency, fairness or reasonableness." Restatement (Second) of Contracts § 205 cmt. a (1981).

31. When a party attempts to renege on or evade its obligations under a contract at the expense of another party to that contract in order to pursue a more profitable opportunity instead, it acts in bad faith. *See Rawlings v. Apodaca*, 151 Ariz. 149, 161, 726 P.2d 565, 161 (1986) (holding that trial court's finding of bad faith was supported by evidence that defendant used tactics including "reneging on promises, violation of industry custom and deliberate attempts to obfuscate" to protect defendant's own financial interest with indifference to the loss caused to another contractual party); Restatement (Second) of Contracts § 205 cmt. d (1981) (listing types of bad-faith conduct, including "evasion of the spirit of the bargain," "willful rendering of imperfect performance," and "interference with or failure to cooperate in the other party's performance").

32. Gilbert Family, through the actions of Drs. Higgins and Hohl, breached the duty of good faith and fair dealing implied in the Lease Agreement. Gilbert Family attempted to evade its obligation to pay the Base Rent calculated under the terms of the Lease Agreement and avoid continuing with the Project. It did so for its own financial gain with indifference to the losses caused to Gilbert MH, evidenced by Gilbert Family's pursuit of the Scottsdale Facility and its potentially greater revenue. Unhappy with the uncapped Base Rent formula to which it had knowingly agreed, Gilbert Family tried to renegotiate or evade the Lease Agreement, willfully depriving Gilbert MH of the benefits of its bargain and rebuking Gilbert MH's

justified expectations under the Lease Agreement. *See supra* Findings of Fact ¶¶52–54, 58–68, 103–109.

33. Concerned about the costs of the Project and the resulting Base Rent, Gilbert Family, through the actions of Drs. Higgins and Hohl failed to cooperate with Gilbert MH's work on design plans during the summer of 2018, thereby interfering with Gilbert MH's ability to perform its obligations under the Lease Agreement and move the Project forward. *See supra* Findings of Fact ¶¶76–81.

34. A covenant of good faith and fair dealing was also implied in the personal Guaranties of Lease executed by the Higgins and Dr. Hohl. By taking their actions to undermine the Lease Agreement, Drs. Higgins and Hohl sought to evade their obligations under the Guaranties of Lease to pay and perform the liabilities, obligations, and duties imposed on Gilbert Family under the Lease Agreement. *See supra* Findings of Fact ¶28.

35. Accordingly, Gilbert Family, the Higgins, and Dr. Hohl are contractually liable to Gilbert MH for Breach of the Duty of Good Faith and Fair Dealing.

**Affirmative Defenses**[11]

36. For the reasons previously stated, the Court finds that Gilbert MH did not fraudulently induce Gilbert Family to execute the Lease Agreement, nor did it fraudulently induce either the Higgins or Dr. Hohl to execute the personal Guaranties of Lease. *See supra* Conclusions of Law ¶17.

---

[11] The parties' Joint Proposed Final Pretrial Order listed as an issue of law "whether [Gilbert MH's] damages should be barred or reduced as a result of conduct by Gilbert MH as asserted in [Gilbert Family's] affirmative defenses set forth in their Answer." (Doc. 61 at 31). Gilbert Family's only contentions on this issue related to fraud in the inducement and breach of Section 5 of Exhibit B-1 of the Lease Agreement, so the Court will address only those affirmative defenses. Additionally, the parties' Joint Proposed Final Pretrial Order listed as an issue of law "Whether Gilbert MH breached its duty of good faith and fair dealing to the Defendants." (Doc. 61 at 30). But Defendants did not assert a counterclaim nor raise this as an affirmative defense in their Answer, so the issue was waived. *See KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 714 (9th Cir. 2020).

37. The Defendants have failed to meet their burden to prove that Gilbert MH breached Section 5 of Exhibit B-1 of the Lease Agreement by failing to timely and adequately provide 75% completed Construction Drawings. *See supra* Findings of Fact ¶85.

**The Applicable Remedial Provision in the Lease Agreement**

38. "Arizona has long held that damages for breach of contract are those damages which arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract." *All Am. Sch. Supply Co. v. Slavens*, 125 Ariz. 231, 233, 609 P.2d 46, 48 (1980). Here, the parties agreed in the Lease Agreement to two potentially applicable termination and remedial provisions: Article 22 (the "Default Provision") and Section 5 of Exhibit B-1 (the "Exit Ramp Provision"). *See supra* Findings of Fact ¶¶110–116.

39. Under Arizona law, courts must "attempt to enforce a contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993). "A contract must be construed so that every part is given effect, and each section of an agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App. 1993). "The court must apply a standard of reasonableness in contract interpretation." *Id.*

40. Reading the Lease Agreement as a whole, the Court finds that the parties intended for the Exit Ramp Provision to apply if the contract was terminated prior to an agreement on the Construction Drawings. The Default Provision clearly contemplates a constructed Project building occupied by Gilbert Family: it requires Gilbert Family to vacate the premises and entitles Gilbert MH to amounts that would be indeterminate until the Project was constructed—much less designed. For example, the amount due to Gilbert MH under the Default Provision depends on the

Fair Market Rental Value of the building as well as the total Rent due to Gilbert MH, which is a function of actual costs and actual market capitalization rate under the Lease Agreement. *See supra* Findings of Fact ¶¶113–114. None of those amounts could be determined with any reasonable certainty prior to construction. On the other hand, the Exit Ramp Provision provides a determinate formula based on costs and expenses incurred, and it would be rendered nearly meaningless if the Default Provision also applied to pre-construction termination of the Lease Agreement. The most reasonable and harmonious interpretation of the Lease Agreement is to apply the Exit Ramp Provision if the contract is terminated before the parties agree on Construction Drawings.

41. Because the Lease Agreement does not define how the parties could effectuate termination, the Court finds Arizona law on rescission of contracts instructive. Rescission "must be clear and unambiguous, conveying the unquestionable purpose to terminate the contract." *Miller v. Crouse*, 506 P.2d 659, 664 (Ariz. Ct. App. 1973). "Although such notice is not required to be formal and may be evidenced by conduct, manifestation of an intent to rescind must be unequivocal." *Id.*

42. No later than October 18, 2018, the date it told Gilbert Family it would list and sell the land for the Project, Gilbert MH exercised its right to terminate the Lease Agreement. *See supra* Findings of Fact ¶123.

43. When Gilbert MH exercised its right to terminate the Lease Agreement, the parties had not agreed to a set of Construction Drawings. *See supra* Findings of Fact ¶92.

44. Thus, Gilbert MH is entitled to a remedy under the Exit Ramp Provision, as that was the remedy that was within the contemplation of the parties when they executed the Lease Agreement in the event that it was terminated under the circumstances that occurred.

///

///

**Amount of Damages**

45. The Exit Ramp Provision requires Gilbert Family to pay Gilbert MH for half of the out-of-pocket expenses incurred by Gilbert MH related to the project, giving credit to Gilbert Family for its $150,000 security deposit. *See supra* Findings of Fact ¶¶20, 116.

46. Still, under Arizona law, the plaintiff must show damages "with reasonable certainty and a reasonable degree of accuracy . . . ." *Harris Cattle Co. v. Paradise Motors, Inc.*, 104 Ariz. 66, 68, 448 P.2d 866, 868 (1968) (internal quotation marks omitted). The plaintiff must "establish adequate foundation for the documents that purportedly support their damages claim" and "provide any additional documentary or testimonial evidence" to assist the factfinder in determining the amount of damages. *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 172, 83 P.3d 1103, 1113 (App. 2004). In other words, it is for the plaintiff to prove its damages to the Court; it is not for the Court to discern damages by poring through hundreds of pages of unorganized, unindexed, unsupported documents. Likewise, it is for the plaintiff to support the value of its damages; it is not for the Court to attempt to guess the value.

47. Gilbert MH has shown with reasonable certainty and a reasonable degree of accuracy that it incurred out-of-pocket costs for the Project in the amount of $600,142.62. *See supra* Findings of Fact ¶¶132–145.

48. Applying the Exit Ramp Provision's formula to the $600,142.62 incurred, Gilbert Family owes Gilbert MH $150,071.31 under the Lease Agreement, which is personally guarantied by the Higgins and Dr. Hohl. *See supra* Findings of Fact ¶¶146–147.

///

///

///

///

49. Thus, Gilbert Family, the Higgins, and Dr. Hohl are liable to Gilbert MH for $150,071.31.[12]

Dated this 1st day of October, 2021.

Honorable Steven P. Logan
United States District Judge

---

[12] Pursuant to Article 42 of the Lease Agreement, Gilbert MH, as the prevailing party in this action, is entitled to its reasonable attorneys' fees. (Ex. 6 at 29). The Court notes that it has already awarded legal fees incurred in furtherance of the Project as out-of-pocket costs. *See supra* note 10. Gilbert MH may file a motion for attorneys' fees, supported by sufficient documentation, for the Court's consideration pursuant to Fed. R. Civ. P. 54(d)(2). The motion should include only fees directly associated with this litigation and should exclude any fees already awarded under these Findings of Fact and Conclusions of Law and the associated Judgment. The Court advises that it will not be inclined to parse through documents or perform recalculations in the event that Gilbert MH fails to comply with this direction.